**RACETRAC PETROLEUM, INC., Plaintiff,**

v.

**PRINCE GEORGE'S COUNTY, et al., Defendants.**

Civ. A. No. R-83-3073.

United States District Court, D. Maryland.

Jan. 31, 1985.

Steven Schaars, Thomas J. Hamilton, Kevin Hartley, Washington, D.C., and Joshua Treem, Baltimore, Md., for plaintiff Racetrac Petroleum, Inc.

Associate Co. Attys. Steven M. Gilbert, Thomas P. Smith, and Michael O. Connaughton, Upper Marlboro, Md., for defendants Prince George's County, Md., Co. Council of Prince George's County, Md., sitting as the Dist. Council, Gerard T. McDonough, William B. Amonett, Frank P. Casula, Parris N. Glendening, Sarah Ada Koonce, Ann Landry Lombardi, Sue V. Mills, Floyd E. Wilson, Jr., and Barry S. Cramp.

Peter Gunst, Baltimore, Md., for defendants Victor Rasheed and Greater Washington/Maryland Service Station Ass'n.

Associate Co. Attys., Arthur S. Drea, Jr., Sanford E. Wool and Thurman H. Rhodes, Upper Marlboro, Md., for defendant Maryland-Nat. Capital Park and Planning Com'n.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

This is an action in which plaintiff, a gasoline retailer and frustrated applicant for a zoning special exception in Prince George's County, seeks damages from the County, various public officials, a state-created planning commission; a local trade association of gasoline retailers, and a former

officer of the trade association.[1] Plaintiff seeks more than twelve million dollars in compensatory, treble and punitive damages, as well as a declaration that a local zoning ordinance is invalid, for alleged violations of the Sherman Act, the Civil Rights Act of 1871, and state law.

Currently before the Court are the following motions:

1. Motion of defendants Association and Rasheed to strike unauthenticated exhibits and other material filed in support of plaintiff's motion for summary judgment against those defendants ("motion one").

2. Motion of defendants Association and Rasheed to strike unauthenticated exhibits to memorandum of points and authorities of the plaintiff in opposition to motion for summary judgment of defendants Association and Rasheed ("motion two");

3. Plaintiff's motion for partial summary judgment against the County, the Council, the Council Members, the Examiner and the Commission ("motion three");

4. Plaintiff's motion for partial summary judgment against the Association and Rasheed ("motion four");

5. Motion of defendants Association and Rasheed for summary judgment ("motion five");

6. Motion of defendants County, Council, Council Members and Examiner for summary judgment ("motion six"); and,

7. Motion of defendant Commission for summary judgment ("motion seven").

All motions have been briefed in an unusually thorough fashion. Oral arguments on the motions were heard on November 2, 1984. Post-argument memoranda were submitted by the plaintiff, by the County Defendants, by the Commission, and by the Association Defendants.

I. *Introduction*

A. *The Facts*

Racetrac entered a contract to purchase property on U.S. Route 1 in College Park, Prince George's County, Maryland, contingent upon Racetrac's obtaining the necessary approval from the County to operate a retail gasoline outlet on the site. At the time of Racetrac's contingent purchase, the property was zoned "R–55" (one-family, detached residential), a classification which prohibits use of the property for automobile filling stations. County Code § 27–215.

Like most zoning statutes, the Prince George's County ordinance creates various types of zones in which certain uses are permitted or prohibited. Automobile filling stations are permitted to be located, without need for special exception, in I–2 Zones (heavy industrial), I–1 Zones (light industrial), and C–M Zones (commercial miscellaneous), as long as certain conditions are met concerning the construction and use of the facility. Prince George's County Code §§ 27–375(b)(4), 27–403.2(c)(2)(a), 27–510(a)(1) through (10). Filling stations are

---

1. The defendants are: Prince George's County, Maryland (hereinafter "the County"); the County Council, sitting as the District Council for zoning purposes (hereinafter "the Council"); Council Members McDonough, Amonett, Cosula, Glendening, Koonce, Lombardi, Mills and Wilson (hereinafter "Council Members"); Zoning Hearing Examiner Cramp ("the Examiner"); the Maryland-National Capital Park and Planning Commission ("the Commission"); the Greater Washington/Maryland Service Station Association ("the Association"); and Victor Rasheed ("Rasheed"), the Association's former Executive Director. The plaintiff is Racetrac Petroleum, Inc. ("Racetrac").

To facilitate discussion, the Court uses the following labels to identify the various defendant groups who share similar legal positions: the "Individual County Defendants" (the Council members and the Examiner); the "Non-Individual County Defendants" (the County and the Council); the "County Defendants" (includes both individual and non-individual county defendants); and the "Association Defendants" (the Association and Rasheed). The Court does not include the Commission when it refers to the County defendants and in this respect departs from the terminology used by the plaintiff in its motions and memoranda. Occasionally, the Court uses the phrase "Governmental Defendants" to indicate both the County Defendants and the Commission.

prohibited in C–O Zones (commercial office) and C–A Zones (ancillary commercial). County Code § 27–375(b)(4). In C–S–C Zones (commercial shopping centers), automobile filling stations are prohibited unless a special exception is obtained. County Code § 27–375(b)(4).

A special exception allowing a filling station in a C–S–C Zone may be issued only if the application meets the requirements for filling stations in C–M Zones and, in addition, the County's District Council[2] finds that the proposed use:

(1) Will have no detrimental effects on vehicular and pedestrian traffic;

(2) Is necessary to the public in the surrounding area; and,

(3) Must not restrict the availability, or upset the balance, of land usage in the area for other trades and commercial uses.

County Code § 27–510.

Rather than seeking rezoning of the property to a classification permitting operation of a retail gasoline outlet, the plaintiff, through counsel, sought to have the subject property zoned C–S–C, a classification in which filling stations are prohibited unless a special exception is obtained. Thus, in November of 1981, plaintiff filed with the Commission Application No. A–9403, by which plaintiff sought rezoning from the R–55 residential zone to the C–S–C commercial shopping center zone, and Application No. S.E. 3312, by which plaintiff sought a special exception to permit the operation of a retail gasoline outlet in a C–S–C zone. Plaintiff's application for C–S–C zoning was approved at all levels of the zoning process. Only the handling of plaintiff's application for a special exception, Application No. S.E. 3312 (hereinafter "plaintiff's application"), is challenged in the instant suit.

Upon the filing of plaintiff's application, it was reviewed by the Commission's Technical Staff. After a field inspection, a review of land uses in the neighborhood, and a review of a "need analysis" submitted by the plaintiff,[3] the staff determined that the statutory requirement that the special-exception use be necessary to the public in the surrounding area was not met in light of the existence of 31 service stations, including 4 gas-only stations, within a two-mile radius of plaintiff's proposed site. The staff concluded that "the abundance of filling stations within the two-mile radius, and particularly to the south on Baltimore Avenue (six additional stations), the already pending application for a filling station, and the declining population, lead the staff to a recommendation for denial."

After the issuance of the Technical Staff Report, the Planning Board of the Commission reviewed plaintiff's special exception application at a public meeting in March of 1982. The Planning Board heard testimony from the plaintiff, the Commission staff, the City of College Park and area residents. The Commission's Planning Board agreed with the staff recommendation and passed a resolution recommending denial of plaintiff's special exception application, because the proposed use "is not in harmony with the purpose and intent of Section 27–510 of the Zoning Ordinance" nor "necessary to the public in the surrounding area, based on a comparison of population with the abundance of filling stations within the two-mile radius." The decision was made by a vote of four in favor and none opposed.

Plaintiff's application was also reviewed by the Zoning Hearing Examiner at public

---

**2.** The District Council is the County Council sitting for the purpose of zoning decisions.

**3.** Although plaintiff now objects to the criterion of "need" for a special exception in the C–S–C zone, a criterion mandated by the County's zoning ordinance, plaintiff never questioned the legality or wisdom of that criterion in the course of the zoning proceedings on its application. The Commission's Technical Staff Report indicates that the plaintiff, prior to any involvement in the case by the Association Defendants, submitted to the staff in support of its application an analysis of plaintiff's proposed use "in proximity to competitive facilities" based on information concerning the relation of the area's population to the "current level of gasoline station service afforded."

hearings held on February 17 and March 5, 1982. Plaintiff offered testimony in favor of its application, including its market analysis purporting to demonstrate the need for the proposed use. The application was opposed at the hearing by the Mayor and City Council of College Park, an adjacent music store, the Association Defendants, a local service station operator, the Commission's Planning Board, and a local citizens' association. In a seven-page decision issued April 12, 1982, the Hearing Examiner recommended denial of plaintiff's application.

Plaintiff filed exceptions to the Examiner's decision and requested oral argument before the District Council, which is the County Council sitting for purposes of zoning decisions. The Council considered the record below and also held a public hearing on June 14, 1982. Presentations were made on behalf of the plaintiff, various opposition groups, the People's Zoning Council and the County Office of Law. By vote of nine in favor, one opposed, and one absent, the District Council passed an Order denying plaintiff's application in accordance with the earlier decision of the Examiner.

Plaintiff filed an appeal from the District Council's denial in the Circuit Court for Prince George's County. On August 5, 1982, plaintiff dismissed its appeal without explanation. Approximately one year later, plaintiff filed the instant suit against the Commission and its Planning Board, which had recommended denial of plaintiff's application; against the Hearing Examiner, who likewise recommended denial; against the Association Defendants, who opposed plaintiff's application; against those members of the County Council who voted to deny plaintiff's application; and against the County itself.

The Association Defendants opposed Racetrac's application both before the Hearing Examiner and before the District Council. Representing a group of gasoline re-

tailers in the Washington-Maryland area, these defendants frequently opposed special exception applications seeking to establish new automobile filling stations. The Association Defendants were motivated at least in part by a desire to protect the competitive positions in the trade held by members of the Association. The Association was a vehicle for organized opposition to zoning amendments allowing new retail gasoline uses, and it boasted in its newsletter of various successes in zoning controversies.

There is no indication in the record of any *ex parte* contacts between any of the Association Defendants and any of the Governmental Defendants with regard to plaintiff's application. Nor is there any indication that the decisions reached by the various Governmental Defendants were based on any considerations other than those appearing in the record before them.

B. *The Complaint*

Racetrac's claims may be summarized as follows.[4] Count One alleges that all defendants conspired to restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1. Count Two alleges that the County Defendants and the Commission conspired to restrain trade by enacting and applying the "need" criterion in violation of Section One of the Sherman Act. Plaintiff alleges in Count Three that the Association Defendants conspired to restrict trade in violation of Section One of the Sherman Act.

Counts Four, Five and Six allege violations of the anti-monopolization provisions of Section Two of the Sherman Act, 15 U.S.C. § 2. Count Four alleges that all defendants monopolized, attempted to monopolize or conspired to monopolize the retail sale of gasoline in Prince George's County. Plaintiff alleges in Count Five that the County Defendants and the Commission illegally used their offices to create such a monopoly. Count Six repeats the

4. The document at issue in this case is the Amended Complaint filed May 21, 1984 (Paper No. 41). Plaintiff's request for leave to file a

second amended complaint was denied by the Court on July 6, 1984.

allegation of Count Four, but only as against the Association Defendants.

Count Seven charges the County Defendants and the Commission with deprivation under color of law of plaintiff's Fourteenth Amendment rights, privileges or immunities. Count Eight[5] alleges that all defendants agreed and conspired under color of law to deprive plaintiff of its Fourteenth Amendment rights.

Finally, Count Nine alleges that Section 7–510(e)(2) of the Zoning Ordinance of Prince George's County is invalid as an unreasonable restraint of trade in interstate commerce and as contrary to the laws and policies of the State of Maryland.

## C. The Contentions

As noted above, the case is currently before the Court on cross motions for summary judgment.

Racetrac's motion for summary judgment against the County Defendants and the Commission (motion three) seeks a judgment of the liability of those defendants on the antitrust counts and a declaration that the zoning ordinance is invalid. Plaintiff asserts that undisputed facts show that the application of the ordinance is a *per se* violation of the Sherman Act, and that the defendants are not immune under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Racetrac has similarly moved (motion four) for summary judgment against the Association Defendants on Count Three of the complaint. Plaintiff asserts that undisputed facts establish an unlawful conspiracy between the Association Defendants and the members of the Association to impede competitors by opposing zoning applications. These actions, contends the plaintiff, constitute a group boycott which is a *per se* violation of Section One of the Sherman Act. The plaintiff denies that the activities of the Association Defendants are protected by First Amendment considerations embodied in the *Noerr-Pennington* doctrine.

The Association Defendants have moved for summary judgment (motion five) on the antitrust and civil rights claims on the basis that undisputed facts preclude the existence of a conspiracy, and that the activities of these defendants are protected by the *Noerr-Pennington* doctrine.

The County Defendants have moved for summary judgment (motion six) on all issues. The grounds for the motion are that no illegal conspiracy existed among the County Defendants, that the Individual County Defendants operated in a quasi-legislative or quasi-judicial function which immunizes them from damage liability, that all County Defendants are immune under the state-action and *Noerr-Pennington* doctrines, and that plaintiff's state law claims are time-barred and frivolous.

The motion for summary judgment made by the Commission (motion seven) asserts that it is entitled to judgment as a matter of law on the basis of the state-action doctrine and on the ground that plaintiff has not shown any facts entitling it to relief under the civil rights laws.

All parties assert that the issues which they have raised are ripe for adjudication in the context of a motion for summary judgment. In particular, all parties agreed at oral argument that no disputed facts remain which are material to the applicability as a matter of law of the state-action and *Noerr-Pennington* doctrines, and public official immunity.[6]

---

5. What the Court denominates as Count Eight is actually titled "Count VII" in plaintiff's complaint. Through apparent inadvertence, plaintiff titled two consecutive counts as "Count VII" and the following count as "Count IX."

6. Plaintiff has attempted to effect an unusual retreat from this position by suggesting, in an unsolicited post-argument memorandum, that only if the Court decides the issue in plaintiff's favor are there no disputes of fact material to the *Noerr-Pennington* question. "Absent adoption of Racetrac's view," argues the plaintiff, "the issue of whether the ... doctrine protects defendants' conduct should be determined by the jury." Plaintiff's Memorandum of November 9, 1984, at 9–10 n. 1.

Because various motions made by the parties raise identical issues, the Court will discuss those dispositive issues seriatim before applying its holdings to the various motions and particular counts of the complaint.

## II. *Discussion*

### A. *The State Action Doctrine*

Both the County Defendants (motion six) and the Commission (motion seven) contend that they are immune from antitrust liability under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The plaintiff asserts (motion three) that the doctrine is not applicable in the case at bar.

In *Parker v. Brown*, the Supreme Court held that state action is exempt from liability under the antitrust laws. *Id.* at 350–2, 63 S.Ct. at 313–14. The exemption is grounded upon the notion that the sovereignty of the states in our federal system precludes a finding that Congress intended to create liability for state action when it enacted the antitrust laws. *Id.* at 351, 63 S.Ct. at 313.

Cases attempting to apply the doctrine have often focused on the question of what constitutes state action. *See, e.g., Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (bar association's adoption and enforcement of minimum fee schedules is essentially private action not shielded by state action doctrine).

In *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), at issue was the validity of a state statute requiring state approval of new automobile dealerships. The statute required an auto maker to advise existing franchisees of its intent to locate a new dealership in their area. The statute also provided that if competing dealers filed a protest against the new location, a hearing was to be provided to determine the effect of the competition on existing franchisees and the public interest. When the statute was challenged on the ground that it gave effect to privately initiated restraint of trade in violation of the Sherman Act, the statute was upheld as a clearly articulated and affirmatively expressed regulatory system designed to displace unfettered business freedom. *Id.* at 109, 99 S.Ct. at 411. "If an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the states' power to engage in economic regulation would be effectively destroyed." *Id.* at 111, 99 S.Ct. at 412 (*quoting Exxon Corp. v. Maryland*, 437 U.S. 117, 133, 98 S.Ct. 2207, 2218, 57 L.Ed.2d 91 (1978)).

During the same year, the Court was faced with the question of whether political subdivisions of a state are immune from antitrust liability when they act as owners and providers of services. *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). The Court held that the *Parker* doctrine does not provide an absolute immunity for political subdivisions. *Id.* Justice Brennan, writing for a four-Justice plurality, concluded that the state-action doctrine exempts only anticompetitive conduct engaged in by a state's political subdivisions pursuant to state policy to displace competition with regulation or monopoly service. *Id.* at 413, 98 S.Ct. at 1136 (plurality). In the absence of evidence that the state either authorized or directed the subdivision to act as it did, there is no immunity. *Id.* at 414, 98 S.Ct. at 1137. "This does not mean that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Id.* at 415, 98 S.Ct. at 1138. It is enough that there is an adequate state mandate for anticompetitive activities, i.e., it is enough to find "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id.* The Chief Justice, concurring in the judgment, reasoned that the dispositive ground should be that the political subdivision was engaging in what was essentially a business activity rather than a

governmental one. 435 U.S. at 418, 98 S.Ct. at 1139 (concurrence, Burger, C.J.).

The Court next considered the relationship between municipalities and the state-action doctrine in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), but prior to the decision in *Boulder* the case of *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed. 233 (1980), was decided.

In *Midcal*, the validity of a state scheme allowing wine producers to dictate wine prices charged by wholesalers was challenged under the Sherman Act. Because state involvement was limited to authorizing and enforcing private price setting, the Court distinguished *New Motor Vehicle Board, supra*, and held that the scheme was not exempted by the *Parker* doctrine. The Court established two standards for antitrust immunity under *Parker*:

> First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy;" second, the policy must be "actively supervised" by the State itself. [citation omitted].

*Midcal, supra*, 445 U.S. at 105, 100 S.Ct. at 943. The Court found that active supervision was absent from the statutory scheme.

In *City of Boulder, supra*, the Court faced the issue of whether a city ordinance prohibiting a cable television company's expansion was brought within the ambit of the state action doctrine solely by virtue of the fact that the city was a "home rule" municipality. The Court held that the city's action could not be said to further or implement any clearly articulated or affirmatively expressed state policy, *id.*, 455 U.S. at 54–56, 102 S.Ct. at 842–43, and thus did not enjoy antitrust immunity. The Court noted the "active state supervision" test used in *Midcal* to assess whether a private actor fell within the *Parker* doctrine, but expressly refused to decide whether a municipal ordinance must also

meet that test. 455 U.S. at 51–52 n. 14, 102 S.Ct. at 840–41 n. 14.

In the wake of these *Parker*-doctrine cases there remains considerable uncertainty as to whether a municipal defendant in an antitrust case need only show a "clearly established and affirmatively expressed state policy," to invoke *Parker* immunity or whether governmental defendants must also make a distinct showing of "active state supervision" as required of private actors in *Midcal*. A recent Supreme Court case, although not involving a political subdivision, adds further to the uncertainty by suggesting that "active supervision" is not a discreet test for state action, but rather merely a factor which may be relevant to the clear articulation test. *Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984).

Not surprisingly, the first point of contention in the case at bar is the nature of the test to be applied in determining whether the state action doctrine applies. The plaintiff contends that a two-part test, derived from *Midcal, supra*, is appropriate, and that the Governmental Defendants[7] are immune only if they can demonstrate both "a clearly articulated and affirmatively expressed state policy" and "active state supervision." The County Defendants and the Commission argue that only the first prong of that test need be met in order to cloak the defendants in state-action immunity.

Lower courts deciding the applicability of the *Parker* doctrine to local governments have disagreed on the appropriate test. *See* ABA Antitrust Section, *Antitrust Law Developments* (2d ed. 1984) at 611 and cases cited therein at n. 86 and 89. Plaintiff argues that its formulation has been adopted in this Circuit in *Ratino v. Medical Service of the District of Columbia*, 718 F.2d 1260 (4th Cir.1983), and *State of North Carolina ex rel. Edmisten v. P.I.A. Asheville*, 740 F.2d 274 (4th Cir.1984) (*en banc*), and followed in this District in *Al-*

---

**7.** The "Governmental Defendants" raising the state-action defense are the County Defendants and the Commission.

*phin Aircraft, Inc. v. Henson,* No. B–81–227 (D.Md. July 3, 1984). Plaintiff's reliance on each is misplaced.

*Ratino* involved private-party defendants who claimed to be implementing state policy. Since no local governments were involved, the Court did not, of course, have any occasion to discuss the issue before this Court concerning the appropriate test to apply to governmental defendants.

Similarly, the *en banc* decision in *Edmisten, supra,* did not address the issue of whether the *Midcal* "active state supervision" criterion should be applied when a local government asserts immunity against liability for actions allegedly taken in furtherance of an articulated state policy. As the *Edmisten* Court noted, the defendant in that case was a private party claiming its actions were authorized by the state. *Edmisten, supra,* 740 F.2d at 276–7. The Court relied upon *Midcal* and other decisions involving private-party defendants, *id.,* but had no occasion to address either issues or decisions involving antitrust actions against local governments. The Supreme Court decision in *City of Boulder,* which plaintiff asserts was reaffirmed by the Fourth Circuit in *Edmisten,* is not cited at all in the *Edmisten* opinion.[8]

Finally, plaintiff argues that the Court is required to apply the active supervision test to the Governmental Defendants by the decision in *Alphin Aircraft, Inc. v. Henson,* No. B–81–227 (D.Md. July 3, 1984). Again, plaintiff's reliance is misplaced. In the first place, the discussion of municipal antitrust liability in *Alphin* is *dicta* since the municipal defendant had

previously been voluntarily dismissed with prejudice. *Id.,* Memorandum Opinion at 1–2 n. 1. Moreover, Judge Black's thoughtful opinion addressed, but expressly refused to adopt, plaintiff's contention that active state supervision is required. *Id.* at 13. The Court noted that "[w]hether this additional showing of active supervision applies to municipalities is doubtful." *Id.* at 13 (citations omitted). It then assumed the requirement *arguendo* and demonstrated that it was met in that case. *Id.*

In light of the above, this Court must treat the issue of whether a local government must show active state supervision to invoke the state action doctrine as one of first impression for this Court. While recognizing that some courts have required that the activities of governmental subdivisions meet the *Midcal* test of active state supervision,[9] the Court adopts the approach taken by the Eighth Circuit in *Scott v. City of Sioux City, Iowa,* 8 Cir., 736 F.2d 1207 (1984), as the better view.

In *Sioux City,* a state statute gave municipalities broad powers to carry out urban renewal projects, including the power to zone or rezone any part of the municipality. The city entered into a contract with a private developer to redevelop its central business district. After expressions of concern by the private developer that the downtown project would be jeopardized by the competition presented by a proposed regional shopping center on the city's edge, the City Council passed zoning ordinances which prevented commercial retail develop-

---

8. Of course, even if the *Edmisten* Court had relied upon *City of Boulder,* it would be of no benefit to the plaintiff inasmuch as the Court in *City of Boulder* expressly declined to decide the validity of the proposition which plaintiff now presses upon this Court. *City of Boulder,* 455 U.S. at 51–52 n. 14, 102 S.Ct. at 840–41 n. 14.

9. *See, e.g., Corey v. Look,* 641 F.2d 32, 37 (1st Cir.1981); *Affiliated Capital Corp. v. City of Houston,* 519 F.Supp. 991, 1027–9 (S.D.Tex. 1981), *reversed on other grounds* 700 F.2d 226 (5th Cir.1983) (panel opinion) 735 F.2d 1555 (5th Cir.1984) (*en banc*).

In *Corey,* the governmental defendant operated a parking authority in competition with the plaintiff and was allegedly attempting to monopolize the parking lot market. The challenged activity did not involve the exercise of a traditional regulatory function by local government. In *City of Houston,* the trial court denied the city's motion for summary judgment based on state-action immunity but entered judgment n.o.v. in favor of the defendants on other grounds. 519 F.Supp. 991. The plaintiff voluntarily dismissed its claim against the city defendant prior to appeal, 735 F.2d 1557, so neither appellate opinion in that case addresses the city's asserted state-action immunity.

ment in the area of the proposed regional shopping center.

Landowners on the city's periphery brought an antitrust action against the City and its council members alleging that the zoning ordinance was enacted solely to prevent competition with the planned downtown development. The Eighth Circuit held that the city's actions were shielded from antitrust liability by the state-action doctrine. *Id.* at 1214.

After concluding that the requirement of "clear articulation" was met by the state's grant of zoning authority to the City, the Court addressed plaintiff's contention that "active state supervision" was also required to invoke *Parker* immunity. The Court noted that the Supreme Court has required state supervision in cases where *Parker* immunity was extended to *private* entities or individuals. *Id.* at 1214. The *Sioux City* Court reasoned that while the state supervision requirement may be necessary to test whether private conduct is truly state action, the state authorization requirement sufficiently meets that need where the actor is local government or local governmental officials. *Id.* at 1214. The Court further noted that the accountability of local governments in the political process distinguishes them from private actors who assert they were acting on behalf of the state. *Id.*

The Eighth Circuit held that local government and local governmental officials whose actions were authorized and contemplated by the state were not required to show "active supervision" in order to be immune from antitrust liability for those actions, at least where the actions were taken in furtherance of a traditional governmental function, such as zoning, designed to protect public health and safety. *Id.*[10]

This Court agrees with the *Sioux City* holding and finds it dispositive of plaintiff's assertion that the Governmental Defendants must show active state supervision. The Supreme Court has never required counties or municipalities to show state supervision. As Justice Rehnquist stated, after noting that the *City of Boulder* majority had avoided the issue, "[i]t would seem rather odd to require municipal ordinances to be enforced by the state rather than the city itself." *City of Boulder, supra,* 455 U.S. at 71 n. 6, 102 S.Ct. at 851 n. 6 (Rehnquist, J., dissenting).

■ Accordingly, this Court holds[11] that where local government takes action authorized and contemplated by the state which action is part of a traditional governmental function, local government and its officials are immune from antitrust liability under the state-action doctrine regardless of whether they can demonstrate that their actions are actively supervised by state officials.[12]

10. *Accord, Tom Hudson & Associates, Inc. v. City of Chula Vista,* 746 F.2d 1370 (9th Cir.1984); *Gold Cross Ambulance Co. v. City of Kansas City,* 705 F.2d 1005, 1014 (8th Cir.1983) *petition for cert. filed,* No. 83–138, 52 U.S.L.W. 3039 (July 25, 1983); *Golden State Transit Corp. v. City of Los Angeles,* 726 F.2d 1430, 1434 (9th Cir.1984); *Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 282–84 (7th Cir.1983) *cert. granted,* —— U.S. ——, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984); *see also City of North Olmstead v. Greater Cleveland Regional Transit Author.,* 722 F.2d 1284, 1287–8 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

11. The Court realizes that its holding today is inconsistent with the language used in its Memorandum and Order rejecting similar contentions made by defendants in support of their motions to dismiss. See Memorandum and Or-
der of May 21, 1984, at 3–4. Having had the opportunity for a fuller consideration of these contentions upon motions for summary judgment, as well as the benefit of recent decisions by the Eighth and Ninth Circuits, the Court disaffirms its earlier language to the extent that it is inconsistent with the holding herein.

12. The Court's holding, like the decision in *Parker v. Brown, supra,* is rendered as a matter of statutory construction, i.e., an effort to determine Congressional purpose regarding the reach of the Sherman Act in light of our federal system. *See Parker v. Brown, supra,* 317 U.S. at 351, 63 S.Ct. at 313. Defendants have not suggested, and the Court does not decide, whether the result is required by the Tenth Amendment. While the Court holds that the governmental defendants need not meet the *Midcal* state supervision requirement, it also holds below, al-

Having determined the proper test to employ where local government seeks to invoke state-action immunity, it remains to be decided whether the standard has been met in the instant case. The issue, then, is whether the actions of the County and its officials in enacting and applying its zoning ordinance were taken in furtherance or implementation of clearly articulated and affirmatively expressed state policy to displace competition with regulation. *City of Boulder, supra,* 455 U.S. at 52, 102 S.Ct. at 841; *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1136 (plurality).

To require a clearly articulated and affirmatively expressed state policy "does not mean ... that a political subdivision must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138. It means only that when the state has not directed *or* authorized an anticompetitive practice, the state's subdivisions are subject to antitrust liability. *Id.* at 416, 98 S.Ct. at 1138. An adequate state mandate for a subdivision's anticompetitive activities exists when it is "found from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id.* at 415, 98 S.Ct. at 1138. A general grant of powers of self-government or "home rule" does not provide sufficient authorization for anticompetitive activities to trigger state action immunity. *City of Boulder, supra,* 455 U.S. 40, 102 S.Ct. at 835.[13]

In the instant case, the challenged restraint, which plaintiff alleges is anticompetitive, is the enactment and enforcement of the zoning ordinance pursuant to which plaintiff's application for a special exception was denied. As discussed above in Section I–A, the Prince George's County scheme allows filling stations in I–2, I–1 and C–M zones as long as certain construction and use guidelines are followed. No special exception is required. Filling stations are prohibited in C–O, C–A and residential zones. They are also prohibited in C–S–C zones unless the District Council finds, in deciding a special exception application, that the proposed filling station is necessary to the public in the surrounding area.

The enactment and enforcement of this zoning scheme constitute the allegedly anticompetitive activities of which plaintiff complains. As discussed above, the Governmental Defendants are immune from liability if these activities were undertaken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with regulation.

The delegation of zoning powers by the State of Maryland to Prince George's County is effected through the Regional District Act which is currently codified at Md.Ann. Code Art. 28 (1983). The Act concerns the "regional district" which is comprised of Prince George's and Montgomery Counties. The Act grants authority to the Commission and to each of the counties.

The purposes pursuant to which the Commission and the County may exercise

---

ternatively, that defendants have sufficiently demonstrated active state supervision of their actions in the instant case.

**13.** Several of the Circuit Courts of Appeal have adopted tests to determine whether a political subdivision was acting pursuant to a clearly articulated state policy to displace competition. *See, e.g., Sioux City, supra,* 736 F.2d 1207, 1211 (8th Cir.1974) (state legislature must have first, authorized activity, and second, intended to displace competition; state policy to displace competition can be inferred if challenged restraint is a "necessary or reasonable consequence" of engaging in the authorized activity); *Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 381 (7th

Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984) (state policy can be inferred if anticompetitive effect a "reasonable or foreseeable consequence" of engaging in the authorized activity); *Springs Ambulance Service, Inc. v. City of Rancho Mirage,* 745 F.2d 1270, 47 Antitrust & Trade Regulation Report 858 (9th Cir.1984) (subdivision must demonstrate not only the existence of a state policy to displace competition, but also that state contemplated kinds of actions alleged to be anticompetitive; policy to displace exists if restraint a necessary or reasonable consequence of engaging authorized activity).

This Court finds it unnecessary to adopt or reject any of these particular formulations.

the delegated powers are identified in § 7–110 which prescribes that

> ... the exercise of all planning, platting, zoning, subdivision control, and all other powers granted in this title to the Commission or to the ... County Commissioners of Prince George's County shall be with the purpose of guiding and accomplishing a coordinated, comprehensive, adjusted, and systematic development of the regional district, the coordination and adjustment of this development with public and private development of other parts of the State ... and the protection and promotion of the health, safety, morals, comfort, and welfare of the regional district.

Md.Code Ann. Art. 28 § 7–110 (1983).

To achieve these purposes, a number of powers are granted. The Act provides for formulation of a general plan for each county, and amendments thereto, and identifies a non-exclusive list of factors and considerations which the counties and the Commission may employ in developing a general plan. Md.Ann.Code Art. 28 § 7–108(a)(3) and (6). Of greater significance to the instant case, the Act grants to the County Council the power to adopt and amend zoning ordinances to regulate, *inter alia*, the location and uses of land and buildings for trade, industry and other purposes. § 8–101. This delegation includes the power to divide the County into districts and zones of any number, shape, or area, and to regulate the uses of property in each zone. § 8–102.

■ The County may amend its zoning ordinances and in so doing "may give consideration to and adopt whatever reasonable requirements, safeguards, and conditions, as may in its opinion be necessary, either to protect surrounding properties from adverse effects which might accrue from the zoning amendment, or which would further enhance the coordinated, harmonious, and systematic development of the regional district." § 8–104(e). Finally, the County is granted the express power to grant or deny special exceptions to its zoning ordinances "upon conditions as may be deemed necessary to carry out the purposes of this article." § 8–110.[14]

**14.** Both plaintiff and defendants have made much of an additional section, added to the Maryland statute in 1983 after the events which are the subject of this action, which provides:

> (a) It has been and shall continue to be the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls.
> (b) It has been and shall continue to be the policy of this State that planning and zoning controls shall be implemented by local government.
> (c) To achieve the public purposes of this regulatory scheme, the General Assembly recognizes that local government action will displace or limit economic competition by owners and users of property.
> (d) It is the policy of the General Assembly and of this State that competition and enterprise shall be so displaced or limited for the attainment of the purposes of the State policy for implementing planning and zoning controls as set forth in this article and elsewhere in the public local and public general law....

Md.Code Ann. art. 28 § 7–108.1.

Defendants contend that the statutory language ("It has been and shall continue to be the policy of this State ...") is dispositive of plaintiff's contention that no clearly articulated policy to displace competition existed at the time of the actions now challenged in this suit. The Court is unpersuaded that the "clear articulation" requirement for state-action immunity can be established *simpliciter* by a *post-facto* legislative pronouncement.

Plaintiff argues that the announcement in 1983 of an express policy to displace competition by zoning regulation conclusively demonstrates that no such policy existed at the time of its application for a special exception. Plaintiff apparently seeks to rely for this conclusion on the proposition that statutory language will not ordinarily be given a redundant or superfluous interpretation when construed by the courts. While this proposition is true as a general matter, its use is as a tool for a Court to glean a legislature's intent in using specific language. Absent a contrary intention, a court properly should presume that a legislative pronouncement was not intended to merely repeat earlier declarations of policy. But such a presumption has no place in cases such as the present one where the statutory language ("It has been and shall continue to be the policy ...") clearly indicates that the legislature intended to be redundant, i.e., that it intended to restate what it believed was already implied by existing statutes. Accordingly, plaintiff's reliance on the 1983 provision must fail.

Because the Court is unpersuaded by the argument of either side concerning the relevance of

■ The Court holds that these provisions of the Regional District Act constitute a clearly articulated and affirmatively expressed state policy to displace free competition among landowners and users of land with local regulation by zoning and planning. The Court further holds that such regulation by zoning and planning, including the use of criteria which take into account the public's need for a proposed use in a given area, and its anticompetitive impact were within the contemplation and authorization of the state legislature.

The General Assembly of Maryland has unmistakably delegated to the Commission and the County Defendants the power to plan, zone, and decide special exceptions regarding the location and use of buildings and land for commercial purposes in Prince George's County. Implicit in this delegation is the authorization to consider the need for various uses in various areas. Equally clear is the anticompetitive impact that such restrictions and regulations necessarily have on landowners' otherwise unfettered right to use their land as they please.

Plaintiff, while conceding that the defendants could apply a criterion of public need to "comprehensive" zoning decisions, disingeniously contends that use of the same criterion in "piecemeal rezoning" is not within the contemplation of the state's authorization.[15] See, e.g., Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment Against Prince George's County Defendants at 25.

Plaintiff's argument ignores the language of Md.Code Ann. Art. 28 § 7–110 which provides that the exercise of planning, zoning and "all other powers granted

in this title" shall be with the same purposes. It likewise ignores the authorization in § 8–110 to grant or deny special exceptions "upon conditions as may be deemed necessary to carry out the purposes of [the] article."

Plaintiff also argues that Maryland case law supports the distinction plaintiff attempts to make between "comprehensive zoning" and "piecemeal rezoning." The distinction made by the cases, however, has nothing to do with the scope of the state's policy of displacing competition with regulation.

Maryland courts have distinguished "comprehensive" zoning from "piecemeal" zoning for the purpose of determining what *procedural* requirements are appropriate for each type of decision. See, e.g., *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 376 A.2d 483 (1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978). This is, of course, consistent with the recognized principle of administrative law that procedural considerations are different in legislative-type decisions than they are in adjudicatory decisions. *See* B. Schwartz, *Administrative Law* § 70 (1976). Neither this principle nor Maryland case law suggests that this procedural distinction is in any sense relevant to the permissibility of using public need as a criterion for determining the location and uses of land and buildings.

In fact, Maryland courts have upheld the use of public-need criteria in special exception decisions regarding automobile filling stations. In *Prince George's County v. Lightman*, 251 Md. 86, 246 A.2d 261 (1968), the County's District Council denied a special exception to allow use of a property as

---

§ 7–108.1, it accords no weight to the passage of this section in deciding the issue of whether the Commission and County Defendants acted pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with zoning regulation.

15. Under plaintiff's analysis, a county is authorized by the state to prohibit the opening of new filling stations in a given area because of its determination that no new facilities are needed in light of existing ones. But a county may not,

argues the plaintiff, pass an ordinance which prohibits the opening of new filling stations in a given zone subject to an applicant's right to demonstrate that existing facilities do not meet the public need in the particular area surrounding the proposed site.

As the Court discusses *infra*, there is no support in Maryland's delegation of zoning authority for such a distinction. Nor can the Court discover the logic of why such a distinction might be made.

an automobile filling station deciding, *inter alia*, that it was "not consistent with land planning principles" to allow another gasoline station in an area in which there were seven other gasoline stations within 2,500 feet of the subject property. *Id.* at 89, 246 A.2d 261. The decision of the District Council was reversed on appeal to the Circuit Court for Prince George's County on the ground that there was no evidence that the proposed special exception was contrary to the County's General Plan or otherwise injurious to the health and safety of area residents or workers. *Id.* at 89–90, 246 A.2d 261. The County, in turn, appealed to the Maryland Court of Appeals which reversed the Circuit Court and held that the special exception application was properly denied. In so holding, the Court of Appeals noted that under Maryland law "the number of filling stations in the vicinity was one of the factors to be considered in sustaining a denial of a special exception for a filling station." *Id.* at 91–92, 246 A.2d 261. *See also American Oil Co. v. Board of Appeals of Montgomery County,* 270 Md. 301, 310 A.2d 796 (1973) (affirming Montgomery County's denial of filling station special exception on basis that applicant had not shown present need for use, as required by local zoning ordinance, in light of other filling stations in same general area; presence of other filling stations can be an important consideration in denying special exception).

■ These Maryland cases, and the authorities cited therein, demonstrate three points. First, plaintiff's contention that the Maryland legislative scheme contemplates local consideration of the public need for a land use only in planning and not in "piecemeal zoning" is absolutely without support in the Maryland cases.[16] Second, the cases indicate that Maryland has a policy, clearly articulated and affirmatively expressed by the State's highest court, to displace competition by local zoning regulation, including the consideration of public need in special exception decisions, subject to judicial review in the state-court system. While most cases applying the state action doctrine have looked solely to legislative enactments to ascertain the existence of a clearly articulated state policy, this Court sees no reason why state policy may not also be gleaned, as it is in other areas of the law, from the holdings of the state courts.

■ Finally, the Maryland decisions show that the State, through its courts, actively supervises the exercise by the counties of the zoning powers which have been delegated by the State. While this Court holds above that a county need not show active state supervision to invoke state-action immunity, the Court also holds, alternatively, that if state supervision were a predicate for *Parker* immunity in the instant case, the requirement would be met by the provisions for state judicial review of local decisions.[17]

**16.** The Court does not mean to suggest that a federal court deciding the applicability of state-action immunity to antitrust liability may defer to state courts on the ultimate issue of whether the state has a clearly articulated state policy so as to trigger *Parker* immunity, for that question is clearly one of federal law. The Court does find it useful to look to the decisions of the state courts for an understanding of the regulatory system which is attacked as violative of federal law. The state-court decisions relied on herein demonstrate, for example, that plaintiff's contention, that state law makes a relevant distinction between planning and piecemeal zoning, is unfounded. State decisions may also, as noted above, provide pronouncements of state policy to which this Court may then apply the *Parker* analysis to determine, as a matter of federal law, whether the clear articulation test has been

met. Finally, state-court decisions reviewing local regulatory decisions may furnish evidence from which the federal court may conclude, again as a matter of federal law, that the state, through its courts, actively supervises the local regulation.

**17.** With regard to the defendant Commission, the asserted requirement of active state supervision is met regardless of the availability of judicial review in the state courts inasmuch as the Commission is itself an agency of the State. *See O & B, Inc. v. Maryland-National Capital Park and Planning Commission,* 279 Md. 459, 369 A.2d 553 (1977); *Prince George's County v. Maryland-National Capital Park and Planning Commission,* 269 Md. 202, 306 A.2d 223 (1973); Md.Code Ann. Art. 28 § 1–101.

What has been said above is sufficient to decide the instant motions insofar as they argue for or against the state-action doctrine as a bar to liability in the instant case. The Court finds no dispute of facts which are material to the doctrine's application to this case and the issue is thus one properly to be adjudicated by cross motions for summary judgment.

■ The Court holds that where local government, in the exercise of traditional governmental functions, takes action authorized and contemplated by the state, local government, and the officials through which it acts are immune from antitrust liability under the state-action doctrine regardless of whether they can demonstrate that their actions are actively supervised by state officials. The Court further holds that the provisions of the Regional District Act constitute a clearly articulated and affirmatively expressed state policy to displace competition with local zoning regulation, including the use of criteria which take into account the public's need for a proposed land use in light of existing uses. The denial of authorization for a proposed use based on such criteria, as well as the anticompetitive impact of such a denial, were within the contemplation and authorization of the state legislature. The decisions and pronouncements of the Maryland courts additionally demonstrate a clearly articulated and affirmatively expressed state policy to regulate land use in this manner.

■ To the extent that the Court is in error in holding that active state supervision is not required of local governments, it holds alternatively that state-court review of local zoning decisions constitutes adequate and active state supervision. It further holds that the defendant Commission is itself a state agency, thereby precluding in all events the necessity of its demonstrating additional state supervision.

Accordingly, the County Defendants and the Commission are immune from antitrust liability for the acts of which plaintiff complains and judgment should be entered in their favor of those claims.

### B. *The Noerr-Pennington Doctrine*

The Association Defendants (motion five) and the County Defendants (motion six) contend that they are immune from liability under the antitrust and civil rights claims by virtue of the *Noerr-Pennington* doctrine. The plaintiff asserts (motion four) that the doctrine is not applicable in this case as a matter of law or, alternatively, that there is an issue of fact as to its applicability. See footnote 5 *supra.*

The *Noerr-Pennington* doctrine derives from *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, which "established that no violation of the antitrust laws can be predicated upon attempts to influence the passage or enforcement of laws, even if efforts in that regard are based upon anti-competitive motives." *Hospital Building Co. v. Trustees of Rex Hospital,* 691 F.2d 678 (4th Cir.1982).

*Noerr* held that a trade association's lobbying before a state legislature was immune from antitrust liability even if its sole purpose was to destroy its competition by means of the legislative action sought. In *Pennington,* the Court similarly held that concerted efforts to influence the actions of the Secretary of Labor did not violate antitrust laws even though intended to eliminate competition. *Pennington, supra,* 381 U.S. at 669–672, 85 S.Ct. at 1592–95. "Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593. "Nothing could be clear-

---

It is interesting to note that the plaintiff, who argues in this Court that active state supervision of anticompetitive local zoning decisions is necessary to avoid federal antitrust liability, eschewed such state supervision in the proceedings about which it now complains. Following

the District Council's final denial of plaintiff's special exception application, plaintiff filed an appeal of right in the state courts which it voluntarily dismissed prior to bringing the present federal action.

er from the [*Noerr*] opinion than that anticompetitive purpose did not illegalize the conduct there involved." *Id.* at 669, 85 S.Ct. at 1593.

■ The *Noerr-Pennington* doctrine is, in effect, an exemption for group solicitation of government action. ABA Antitrust Section, *supra*, at 613. The doctrine is one of statutory construction rooted in the principle that the Court will not lightly impute to Congress an intent to invade First Amendment freedoms or to hinder the mechanisms of representative democracy. *Noerr, supra*, 365 U.S. at 137–8, 81 S.Ct. at 529–30.

In *California Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the *Noerr-Pennington* protection was extended to immunize efforts to seek governmental action from administrative agencies and courts. *Id.* at 510, 92 S.Ct. at 611. While thus extending the range of petitioning immunized by the doctrine, the Court also delineated the contours of the "sham" exception to the *Noerr-Pennington* doctrine in the context of adjudicatory proceedings. The Court held that no immunity attaches where a defendant's petitioning is used, not to influence the governmental agency, but "to harrass and deter [competitors] in their use of administrative and judicial proceedings" so as to deny them access to the tribunals. *Id.* at 511–512, 92 S.Ct. at 612–13. The Court also suggested that the sham exception would encompass other unethical con-

duct in the setting of the adjudicatory process, including perjury, misrepresentation, or the bringing of baseless, repetitive claims, amounting to abuse of process. *Id.* at 512–13, 92 S.Ct. at 612–13. Where such abuse of process produces "an illegal result, *viz.*, effectively barring [competitors] from access to the agencies and courts ... [defendants] cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id.* at 513, 92 S.Ct. at 613.

The decision in *California Motor Transport* has been followed by confusing and contradictory decisions in the lower courts concerning the scope of the sham exception to *Noerr-Pennington* immunity. ABA Antitrust Section, *supra*, at 614–18. A review of the briefs submitted by the parties on this issue and the authorities relied on therein reveals judicial language that would suggest support for a variety of views in a given case. Some of the confusion surrounds the significance of the actor's intent in determining whether his actions are immune.[17a] Confusion also arises from language in the decisions concerning the effect of a broader anticompetitive conspiracy on the protection accorded for actions taken in petitioning governmental action.[18]

■ In order to decide whether the conduct proved is protected by *Noerr-Pennington* or excepted as sham conduct, it is necessary to focus on the fundamental in-

---

**17a.** For example, plaintiff relies, *inter alia*, on language to the effect that "the critical inquiry with respect to alleged frivolous litigation is whether the challenged litigation is undertaken with intent to interfere directly with a competitor's business." *Hospital Building, supra*, 691 F.2d at 687. This language, drawn from *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533, and from *California Transport*, 404 U.S. at 511, 92 S.Ct. at 612, is certainly a correct statement of the law if examined in the context of those decisions. But plaintiff would interpret this focus on intent as meaning that there is no *Noerr* protection for one who seeks governmental action for an anticompetitive purpose, an interpretation clearly at odds with the holding in *Noerr* that efforts to obtain a favorable governmental decision are protected even if their *sole* purpose is to destroy the competition.

As will be seen in the discussion *infra*, the confusion results from the failure to distinguish the immediate purpose of a defendant's action from the defendant's ultimate anticompetitive motive.

**18.** Compare *MCI v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1159–60 (7th Cir. 1983), *cert. denied*, — U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (defendant's FCC filings protected by *Noerr-Pennington* but other activities not aimed at influencing governmental action not protected) *with Scott v. City of Sioux City*, Trade Cas. (CCH) § 65,203 (N.D.Iowa 1982) (where legitimate lobbying is combined with illegal actions, the *Noerr-Pennington* exemption has no application).

tent imputed to Congress by these judicial doctrines. The thrust of *Noerr* and its progeny is that Congress did not mean to subject to antitrust liability actions which have the immediate purpose of influencing legitimate governmental decision-making processes. Speech or organizing aimed at influencing decision-makers is protected regardless of the fact that the actor is entirely motivated by self-interest. That the speaker's ultimate purpose is the destruction of all competition is entirely irrelevant to the *Noerr-Pennington* inquiry. The broad protection afforded by this doctrine serves the necessarily related ends of protecting the speaker's freedom of expression and preserving the decision-making processes required by a representative democracy.

■ While the actor's ultimate, anticompetitive motive is irrelevant to the *Noerr-Pennington* inquiry, the actor's immediate purpose in engaging in the conduct proved *is* relevant. In determining whether the challenged conduct is protected or sham, the court must initially decide whether the immediate objective of the actor was to achieve his anticompetitive purpose by obtaining legitimate governmental action or by abusing governmental process in order to prevent legitimate governmental decision-making.

If the actor seeks to persuade government to make a decision that will harm his competitor, that persuasion is protected. But if the speech is designed not to influence a decision, but rather to bar a competitor from the decision-making process, there is no protection. Similarly, if the immediate aim of the actor is the corruption of the decision-making process by bribery or misrepresentation, there is no protection. These forms of conduct are unprotected shams because their immediate aim is not to obtain a governmental decision, but rather to harm a competitor directly by preventing one.

So understood, the sham exception serves the same purpose as the *Noerr-Pennington* doctrine of which it has become a part. The exception protects free speech and the governmental decision-making process by attaching liability to those who would act to muffle the voices of competitors seeking access to government.

■ Where a defendant engages in both protected and unprotected activities, those activities are to be viewed separately in determining the defendant's liability under the antitrust laws. As the Court stated in *Pennington*:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

381 U.S. at 670, 85 S.Ct. at 1593. Thus, the illegal activities do not remove the immunity enjoyed by the protected ones.[19]

With this framework in mind, the Court turns to the record before it. Although the sweeping allegations of earlier pleadings raised a question as to whether the conduct of the Association Defendants was such as to fall within the sham exception to the *Noerr-Pennington* doctrine,[20] it is now clear that the plaintiff has not established facts sufficient to withstand summary judgment on this issue.

Viewing all facts in the record, and inferences therefrom, in a light most favorable to the plaintiff, plaintiff will be able to prove at best that the Association Defendants conspired with Association members to oppose and defeat a number of zoning applications, including the special exception application filed by the plaintiff. Because

---

**19.** Of course, the converse is also true. That some of a defendant's conduct is protected by *Noerr-Pennington* immunity does not preclude defendant's liability for unprotected acts. *MCI,* footnote 15 *supra.* And protected acts may sometimes be used as evidence to show the unlawful purpose with which a defendant engaged in unprotected acts. *Id.; Webb v. Utah Tour Brokers Assn.,* 568 F.2d 670, 674 (10th Cir.1977).

**20.** *See* Memorandum and Order of May 21, 1984, at 5; Memorandum and Order of May 1, 1984, at 3.

all of the Association Defendants' actions were aimed at persuading the District Council to affirm the Examiner's decision to deny plaintiff's application, the Association Defendants' conduct is protected activity under the *Noerr-Pennington* doctrine, notwithstanding the allegedly anticompetitive purpose of the defendants' opposition.

Plaintiff has established no facts which could bring the instant case within the sham exception to *Noerr-Pennington*. Defendants' actions had neither the purpose nor effect of barring plaintiff's access to governmental process. At every stage at which Racetrac's application was reviewed, and before every body considering plaintiff's application,[21] plaintiff was afforded a full opportunity to present its views and to support them with evidence. At each stage, plaintiff's views were considered and rejected as insufficient to meet the standards of applicable zoning ordinances.[22] Plaintiff had the opportunity under Maryland law to have its denial reviewed in the Circuit Court of Prince George's County, a right which plaintiff initially asserted and then waived by voluntary dismissal of its appeal.[23]

■ Because all proceedings were initiated by the plaintiff, there can be no suggestion that the instant case is one where the plaintiff was subjected to baseless litigation in order to delay its entry into the market. The only burden placed upon plaintiff was to meet the standard imposed by ordinance for obtaining an exception to operate a filling station in an area where they are otherwise prohibited. It defies logic to suggest, as plaintiff apparently does, that the fact that the Association Defendants presented opposing evidence at some proceedings on the issue of whether the statutory standard was met constitutes a denial of access to governmental process or some other form of sham conduct. If this be sham conduct, the *Noerr-Pennington* doctrine is a nullity.[24]

Plaintiff likewise has failed to adduce any evidence indicating that the conduct of the Association defendants involved any corruption or abuse of governmental process so as to bring their actions within the sham exception. Plaintiff's initial allegations of a far-flung conspiracy between Association Defendants and County Defendants are entirely without support in the record and cannot survive the instant motions for summary judgment. The factual record contains no hint of any *ex parte* contact or other improper conduct on the part of any of the defendants.

---

**21.** Plaintiff filed its special exception application in November of 1981. The Commission's technical staff report recommended denial of the application prior to any involvement in the case by the Association Defendants. Plaintiff was afforded a two-day hearing before the hearing examiner at which plaintiff's application was opposed by a variety of local groups and individuals, including the Association Defendants. Racetrac was also given a hearing before the Planning Board of the Commission at which hearing the Association Defendants did not appear. Finally, Racetrac appealed the denial of its application to the County Council sitting as the District Council.

**22.** At no stage of the zoning process did plaintiff challenge the propriety of the zoning ordinance under which its application was considered. Nor did plaintiff ever complain of any impediments to a full presentation of its views before each body considering its request.

**23.** Upon inquiry from the Court at oral argument, counsel for the plaintiff offered no explanation as to why plaintiff did not pursue its

appeal in state court of the decision denying its special exception application.

**24.** Plaintiff argues that opposition of the Association Defendants to a number of special exception applications constitutes the bringing of repetitive and baseless claims with the purpose and effect of discouraging competitors from invoking governmental process. The Court rejects this contention for a number of reasons. First, there is no evidence that defendants' opposition was either automatic or baseless. Second, the record indicates that the intent of the Association was to defeat applications, a protected activity. Third, the opposition of defendants imposed no additional burdens on applicants. Fourth, there is no evidence that any potential applicants were discouraged from invoking the zoning processes. As discussed above, it is clear that plaintiff was never hindered or dissuaded from bringing and pressing its application. Thus, even if plaintiff's claim of baseless and reflexive opposition was supported by facts, which it is not, the injuries which it asserts have no relation to that claim.

■ In sum, the Court holds that the conduct of the Association Defendants in opposing Racetrac's application was protected under the *Noerr-Pennington* doctrine which immunizes these defendants as a matter of law from antitrust liability for their actions. There are no disputed facts material to the applicability of *Noerr-Pennington* immunity.

Having so held, it remains for the Court to determine two related issues: 1) whether the *Noerr-Pennington* doctrine also precludes the liability of the Association Defendants on the federal civil rights claim; and 2) whether the fact that *Noerr-Pennington* precludes the liability of the Association Defendants for their opposition also requires that the County Defendants be held immune from liability for their decisions.

As discussed above, the *Noerr-Pennington* doctrine was announced as one of statutory construction in keeping with the principle that the courts impute to Congress an intent to legislate in a fashion consistent with constitutional safeguards. Although *Noerr-Pennington* stands as a construction of federal antitrust law, the Association Defendants urge that its First Amendment underpinnings are equally applicable to liability under the civil rights laws.

■ In various contexts, courts have held that defendants are constitutionally immune from liability for exercising their right to petition regardless of whether the basis of the asserted liability was statutory, *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342–46 (7th Cir.1977), or common law. *Sierra Club v. Butz*, 349 F.Supp. 934, 938–9 (N.D.Cal.1972). This Court agrees with the Association Defendants that *Noerr-Pennington* immunity for petitioning activities extends to claims brought under 42 U.S.C. § 1983. *Accord, Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614–15 (8th Cir.1980); *Westborough Mall v. City of Cape Girardeau*, 532 F.Supp. 284 (E.D.Mo.1981), *reversed in part on other grounds*, 693 F.2d 733 (8th Cir.1982). Accordingly, the Association Defendants are also immune as a matter of law on plaintiff's § 1983 claim.

The County Defendants (motion six) adopt the *Noerr-Pennington* arguments advanced by the Association Defendants and assert that *Noerr-Pennington* immunity extends to them by implication. "[I]f the private defendants cannot be liable for presenting their case in [zoning] proceedings," contend the County Defendants, "then the County Defendants likewise cannot be liable for accepting the evidence and argument and ultimately ruling in their favor."[25] While the symmetry of defendants' argument gives it a certain appeal, the Court finds it unsupported by either case law or the underlying rationale of the *Noerr-Pennington* doctrine. *Noerr-Pennington* is designed to protect the speech and associational activities of private parties petitioning their government. While governmental decision-makers are also in need of protection against liability for the good faith performance of their duties, such protection is embodied in doctrines, which doctrines are treated elsewhere in this Memorandum,[26] which are distinct from *Noerr-Pennington*.

## C. *The Civil Rights Claims: Due Process and Equal Protection.*

Plaintiff alleges in Count Seven that the County Defendants and the Commission "were acting under color of law and subjected plaintiff to the deprivation of rights, privileges, or immunities secured to them [sic] by the Fourteenth Amendment." In Count Eight[27] plaintiff asserts that all defendants were acting under an agreement and conspiracy "under the color of law" to deprive plaintiff of rights guaranteed by the Fourteenth Amendment.

Plaintiff's civil rights claims adopt the factual assertions made with regard to its antitrust claims. Plaintiff contends that

---

**25.** Memorandum in Support of County Defendants' Motion for Summary Judgment at 48.

**26.** See Sections IIA, D, and F herein.

**27.** See footnote 3 herein.

under these facts all the defendants have violated, under color of law, plaintiff's Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.[28] The Association Defendants (motion five), the County Defendants (motion six) and the Commission (motion seven) have all moved for summary judgment on the civil rights claims on a variety of grounds.

42 U.S.C. § 1983 creates civil liability for deprivations of certain federal rights under color of state law. In response to the Court's inquiry at oral argument as to the specific rights of which plaintiff alleges a deprivation, counsel for the plaintiff stated that plaintiff's § 1983 claim is based on violations of plaintiff's right to due process and equal protection as secured by the Fourteenth Amendment.[29]

 Claimed deprivations of equal protection and substantive due process are analyzed similarly. *Scott v. City of Sioux City, supra,* 736 F.2d 1207, 1216. Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, the constitutionality of the statutory classification is presumed. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). The standard for judging the constitution-

ality of local economic regulation is the "rational basis" test which requires only that the regulation be rationally related to a legitimate state interest. *Id.* at 303, 96 S.Ct. at 2517; *Scott v. Sioux City, supra,* at 1216; *Delight Inc. v. Baltimore County,* 624 F.2d 12, 14 (4th Cir.1980). The judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. *New Orleans v. Duke, supra,* 427 U.S. at 303, 96 S.Ct. at 2517.

 Applying this standard to the case at bar, the Court holds that the actions of the defendants did not distinguish on the basis of suspect classifications nor interfere with any fundamental rights. The Court further holds that the passage and enforcement of the local ordinance in question bear a rational relation to a legitimate state interest in regulating land use, and that this interest is within the state's police power. There is no evidence in the record that the ordinance's classification involves invidious or arbitrary discrimination. Accordingly, summary judgment should be granted in favor of the defendants on plaintiff's substantive due process and equal protection claims.

**28.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**29.** Plaintiff suggested in an earlier memo that its § 1983 action was predicated upon the denial of "the right or privilege to compete as guaranteed by the federal antitrust laws." Plaintiff's Opposition to County Defendants' Motion for Summary Judgment at 16. This contention is at variance with plaintiff's complaint and was apparently abandoned by plaintiff at oral argument. In any event, the Court does not believe

that violation of the antitrust laws may be the basis for a § 1983 action under the holding in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (violation of Social Security Act may be basis for § 1983 liability), that some federal statutes may provide rights which may be redressed by § 1983. The Sherman Act is more akin to the pollution control and marine protection acts reviewed by the Court after *Thiboutot* in *Middlesex County Sewerage v. Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In *Middlesex,* the Court held that the existence of express and comprehensive remedies in those acts demonstrates that Congress intended to preclude or supplant any remedy otherwise available under § 1983. *Id.* at 20–21, 101 S.Ct. at 2626–27. *See also Hymes v. Harnett County Board of Education,* 664 F.2d 410, 412 (4th Cir.1981); *Day v. Wayne County Board of Auditors,* 749 F.2d 1199 (6th Cir.1984); *Chesapeake Bay Foundation v. Virginia State Water Control Board,* 501 F.Supp. 821 (E.D.Va. 1980).

■ To the extent that plaintiff's § 1983 claim is predicated on a denial of procedural due process, it must likewise fail. In order to state a procedural due process claim, plaintiff must be able to demonstrate at the outset that it possessed "a legitimate claim of entitlement" to the zoning special exception which it was denied by means of state action. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Scott v. Greenville County*, 716 F.2d 1409, 1418 (4th Cir.1983); *United Land Corp. v. Clarke*, 613 F.2d 497, 501 (4th Cir.1980); *Scott v. Sioux City, supra*, 736 F.2d at 1217. If plaintiff had no protectible interest, the county could not have infringed plaintiff's Fourteenth Amendment rights. *United Land, supra*, at 501.

■ In the instant case, plaintiff has established neither facts nor argument that support the existence of an interest protected by the Fourteenth Amendment from deprivation without procedural due process. There is no evidence of any state or local law, express contract or mutual understanding with the defendants upon which an entitlement could be based. *Perry v. Sinderman*, 408 U.S. 593, 600–603, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972); *United Land, supra*, at 501.[30] Because plaintiff had no protectible interest which was infringed by the defendants, plaintiff's procedural due process claim must fail.

■ Moreover, even if plaintiff could demonstrate a protectible property or liberty interest sufficient to trigger procedural due process protection, defendants would still be entitled to summary judgment because the undisputed facts in the record demonstrate that due process was furnished the plaintiff at every stage of its effort to obtain a special exception applica-

tion. Plaintiff was afforded an opportunity to present argument and testimony before both the hearing examiner and the Council. As noted earlier in the Court's discussion of the *Noerr-Pennington* doctrine, there is absolutely no evidence of procedural impropriety or other corruption of the hearing and decision-making processes. Plaintiff was also afforded an opportunity for judicial review of the decision in state courts, an opportunity which it voluntarily eschewed.[31] Due process requires no more.

For these reasons, it is clear that plaintiff's § 1983 claims must fail and that all defendants are entitled to summary judgment on those counts. For the sake of judicial economy in the event that the Court's holding herein is later reviewed, the Court also notes alternative grounds entitling the Association Defendants to summary judgment on the civil rights claim. As discussed above, the Court holds that all actions of the Association Defendants which worked to the detriment of the plaintiff were within the protection of the *Noerr-Pennington* doctrine and thus immune from liability under either the civil rights laws or the antitrust laws.

■ The Court also holds, alternatively, that since plaintiff can produce no evidence of a conspiracy or other concert between the Association Defendants and the Governmental Defendants, plaintiff's civil rights claim against the Association Defendants fails because of plaintiff's complete inability to support its allegation that the Association Defendants acted under color of law as required in order to state a Fourteenth Amendment claim.

As discussed below, the Court's holding that the Individual County Defendants are cloaked with public official immunity is an alternative ground for the entry of summa-

---

**30.** The ordinance which plaintiff now challenges was in effect prior to the time plaintiff acquired any interest in the subject property and prior to plaintiff's special exception application. The case is thus readily distinguishable from *Scott v. Greenville County*, 716 F.2d 1409, 1418–19 (4th Cir.1983), where plaintiff was entitled to a building permit under then-existing

state law, which permit was later denied after unlawful intervention by the county council.

**31.** *Cf. Ingraham v. White*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (post-deprivation judicial redress may provide sufficient due process).

ry judgment in their favor on the civil rights claims.

### D. *Public Official Immunity*

Individual County Defendants contend (motion six) that they are immune from damage claims in both the antitrust and civil rights counts under the doctrine of public official immunity. Defendants assert that the Council members and the Examiner enjoy absolute immunity for their actions in denying plaintiff's special exception application because they "acted both quasi-legislatively and quasi-judicially, and ... the action was 'prospective.'" Defendants argue persuasively that the confluence of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (extending absolute judicial immunity to federal executive officers engaged in adjudication), and *Bruce v. Riddle,* 631 F.2d 272 (4th Cir.1980) (extending absolute legislative immunity to county legislators functioning in a legislative capacity) militates in favor of extending absolute immunity to the official decision-making of the defendants in the instant case.

The plaintiff, in turn, relies upon *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir. 1983), where the Court, per Chief Judge Winter, held that county council members who sought to prevent administrators from issuing a building permit did not enjoy absolute legislative immunity, but instead could claim only a qualified executive immunity. *Id.* at 1422.

In *Scott v. Greenville County,* the efforts of the defendants to block issuance of a permit were not part of their ordinary official function. In fact, the council members were barred from involvement in the permit-issuing process by the terms of their own ordinance. *Id.* at 1413 and 1419. Their intervention was "extraordinary and unlawful" under local law. *Id.* at 1419. In light of these facts, the defendants in the instant case argue that the *Scott* holding, that council members did not enjoy absolute legislative immunity, is based on the extraordinary and *ultra vires* character of

their actions in that case. Because the county officials in the case at bar acted officially and as required by local law, argue the defendants, the *Scott* holding may be readily distinguished.

While this Court agrees that *Scott* may be distinguished on the facts, the language of that opinion is more difficult to reconcile with defendants' assertions. In holding that only a qualified immunity applied, the Court stated the issue as whether the council members "were functioning in a legislative capacity." *Id.* at 1422.

> When local zoning officials do more than adopt prospective, legislative-type rules and take the next step into the area of enforcement, they can claim only the executive qualified immunity appropriate to that activity.

*Id.* at 1423. *See also Fralin & Waldron, Inc. v. County of Henrico, Va.,* 474 F.Supp. 1315, 1320 (E.D.Va.1979), cited with apparent approval in *Scott,* 716 F.2d at 1422.

Assuming without deciding that the Individual County Defendants are entitled only to a qualified immunity, the merits of that defense are to be decided in accordance with the standards set forth in *Harlow v. Fitzgerald.* *Scott,* 716 F.2d at 1423. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982), the Court held that qualified immunity shields from liability for civil damages discretionary conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

 Plaintiff argues that this qualified immunity standard is not met by the County Defendants because their actions in denying plaintiff's special exception application violated the "clearly established law," set forth in *Community Communications v. City of Boulder, supra,* that anti-competitive zoning decisions may be made only pursuant to a clearly articulated state policy to displace competition through regula-

tion.[32] Because the Court holds above that the enactment and enforcement of the Prince George's County zoning ordinance were pursuant to a clearly articulated state policy as required by *City of Boulder*, the official actions of the Individual County Defendants did not violate a clearly established statutory or constitutional right as urged by the plaintiff. Accordingly, their actions are immune from liability under the qualified immunity standard of *Harlow v. Fitzgerald, supra*, 457 U.S. at 818, 102 S.Ct. at 2739, as applied in *Scott v. Greenville County*, 716 F.2d at 1423. Because the Individual County Defendants are immune under the qualified immunity test, the Court need not decide whether they should be afforded absolute immunity for their conduct in applying the ordinance to deny plaintiff's special exception application.[33]

### E. *Conspiracy Between County and Association Defendants.*

While the grounds discussed above are sufficient to decide all of the federal claims before the Court, the Court notes that several of the cross motions for summary judgment have raised the question of whether plaintiff has established a triable issue as to the existence of a conspiracy between the Association Defendants and the Governmental Defendants. In order to provide the parties with the benefit of the Court's decision on this issue in the event that appellate review is sought, the Court holds, in the alternative, that plaintiff has failed to establish evidence sufficient to create a material dispute of fact on this question and that, as a matter of law, no conspiracy existed between any of the Association Defendants and any of the County Defendants.[34]

■ A review of the record's undisputed facts, and disputed facts favorable to the plaintiff, reveals a zoning process that was unusual only for its sheer ordinariness. In the end, plaintiff can establish only that it applied for a special exception, that a variety of self-interested third parties opposed its application, and that at several levels of governmental review the decision-makers sided with plaintiff's opponents. If the plaintiff has made out a triable case of conspiracy, then surely there is not a frustrated zoning applicant in the land who cannot also make out a case and, in the process, haul every opponent and decision-maker before a federal tribunal.

Because plaintiff cannot establish this conspiracy, all defendants are entitled to summary judgment on Count One which alleges an Association-Governmental conspiracy in violation of Section One of the Sherman Act. Similarly, all defendants are entitled to summary judgment on Count Four's allegation of an Association-County conspiracy to create a monopoly in violation of Section Two of the Sherman Act. Because the County Defendants are incapable of violating the Sherman Act's monopolization prohibition absent a conspiracy, the Court's holding also requires that judgment be entered in favor of the County Defendants and the Commission on Count Five.

As noted earlier, the failure of plaintiff to establish any facts from which an Association-Governmental conspiracy could be inferred also precludes the liability of the

---

**32.** Plaintiff argues that the *Boulder* decision represented "clearly established law" of "tremendous significance" which defendants should have known was applicable to their conduct in deciding plaintiff's special exception application. Plaintiff does not explain its failure to argue, or even suggest, at any stage during the zoning proceedings that the *Boulder* decision was relevant to the decision before the County Defendants.

**33.** It is clear that to the extent that plaintiff would allege liability based on the *enactment* of

the zoning ordinance's need criterion, the Individual County Defendants are absolutely immune. *Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980).

**34.** The Court does not decide as a matter of law whether plaintiff can establish a conspiracy among the Association Defendants and Association members. Similarly, the Court does not decide whether any conspiracy may have existed among the Governmental Defendants.

Association Defendants under Count Eight, which alleges conduct under color of law.

While a question such as the existence of a conspiracy, depending as it often does upon inferences drawn from circumstantial evidence, is rarely one for adjudication on motion for summary judgment, the Court is convinced that justice and the law require such a determination in this case. The facts mustered by plaintiff in support of its conspiracy theory are as meager as its allegations are broad.

#### F. *State-Law Claims*

■ Count Nine of plaintiff's Amended Complaint alleges that Section 7–510(e)(a) of the Zoning Ordinance of Prince George's County is invalid as an unreasonable restraint of trade in interstate commerce and as contrary to the laws and policies of the State of Maryland. To the extent that this claim seeks a declaration that the County Ordinance is invalid under federal antitrust laws, judgment should be entered for the defendants on the basis of the state action doctrine, discussed above. As noted there, the state action doctrine is a declaration that, in passing the federal antitrust laws, Congress did not mean to proscribe state regulation, or local regulation enacted pursuant to state policy, even where such regulation has the effect of restraining trade.

The County Defendants have also moved (motion six) for summary judgment on Count Nine to the extent that it purports to state claims under the laws of Maryland. In opposition to that motion, plaintiff contends that this Court may properly hear plaintiff's state law claims under the doctrine of pendant jurisdiction. Because the Court today decides that summary judgment should be entered in favor of defendants on all federal claims, the state claims over which the Court has pendant jurisdiction should be dismissed as well. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).[35]

### III. *Conclusion*

What has been said above is sufficient to dispose of the cross motions for summary judgment [36] (motions three through seven) and to enter judgment on each count of plaintiff's complaint.[37]

With regard to Count One, all defendants are entitled to summary judgment as a matter of law: the County Defendants and the Commission on the basis of the state-action doctrine,[38] and the Association Defendants on the basis of the *Noerr-Pennington* doctrine.[39] Alternatively, judgment should be entered in favor of the Individual County Defendants because they enjoy public official immunity,[40] and in favor of all defendants because there is no evidence of the conspiracy alleged in this count.[41]

The claim in Count Two against the County Defendants and the Commission must fall in light of state-action immunity.[42] Alternatively, the Individual County

---

**35.** Even if the plaintiff had successfully asserted another basis for the exercise of federal subject-matter jurisdiction, the Court might well decline to exercise such jurisdiction over state-law issues involving in a complex local regulatory system. *See Louisiana Power & Light v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *but see County of Alleghany v. Frank Mashuda Co.,* 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); *cf. Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Caleb Stowe Associates, Ltd. v. County of Albemarle,* 724 F.2d 1079 (4th Cir.1984); *Fralin & Waldron, Inc. v. City of Martinsville,* 493 F.2d 481 (4th Cir.1974).

**36.** The cross motions for summary judgment are summarized in Section I–C herein.

**37.** The counts of plaintiff's complaint are summarized in Section I–B herein.

**38.** See Section II–A herein.

**39.** See Section II–B herein.

**40.** See Section II–D herein.

**41.** See Section II–E herein.

**42.** See Section II–A herein.

Defendants prevail on the basis of public official immunity.[43]

The Association Defendants, claimed against in Count Three, are entitled to judgment in their favor on that count on the basis of *Noerr-Pennington* immunity.[44]

With regard to the monopolization counts, judgment will be entered for the Association Defendants on Counts Four and Six on *Noerr-Pennington* grounds. Public official immunity[45] precludes liability of the Individual County Defendants on Counts Four and Five, and all County Defendants and the Commission will be granted summary judgment on Counts Four and Five on the basis of the state action doctrine.[46] The failure to establish a conspiracy between the Association Defendants and the Governmental Defendants is an alternative basis for the grant of summary judgment in favor of all defendants on Count Four and Count Five.[47]

Judgment will be entered in favor of all defendants on Counts Seven and Eight because plaintiff has failed to make out a triable claim under § 1983.[48] Alternatively, judgment for the Association Defendants is given on the basis of *Noerr-Pennington*[49] and plaintiff's failure to show that these defendants acted under color of state law.[50] An alternative ground for granting the summary judgment motions of the Individual County Defendants on Counts Seven and Eight is public official immunity.[51]

To the extent that plaintiff's claim under Count Nine relies on federal law, it fails under the state-action doctrine.[52] To the extent that plaintiff seeks relief under the laws of Maryland, the claim is dismissed without prejudice because pendant jurisdiction is no longer proper and because the claims are ones which the Court should abstain from resolving.[53]

In addition to the motions for summary judgment, two motions to strike made by the Association Defendants (motions one and two) are before the Court. Because the Court believes that the inclusion in the record of the allegedly objectionable materials would not alter the decision on the cross motions for summary judgment, it finds a decision on defendants' motions to strike unnecessary.

For the reasons stated herein, it is this 31st day of January, 1985, by the United States District Court for the District of Maryland,

ORDERED:

1. That plaintiff's motions for partial summary judgment are DENIED;

2. That the motion for summary judgment of defendants Association and Rasheed is GRANTED;

3. That the motion for summary judgment of defendants County, Council, Council Members and Examiner is GRANTED IN PART and DENIED IN PART;

4. That the motion for summary judgment of the defendant Commission is GRANTED;

5. That judgment be entered against the plaintiff and in favor of the defendants on Counts One through Eight;

6. That judgment be entered against the plaintiff and in favor of the defendants on Count Nine insofar as that Count seeks relief under the laws of the United States;

7. That plaintiff's claim on Count Nine insofar as it seeks relief under the laws of Maryland is DISMISSED WITHOUT PREJUDICE; and,

43. See Section II–D herein.

44. See Section II–B herein.

45. See Section II–D herein.

46. See Section II–A herein.

47. See Section II–E herein.

48. See Section II–C.

49. See Section II–B herein.

50. See Sections II–C and II–E herein.

51. See Section II–D herein.

52. See Section II–A herein.

53. See Section II–F herein.

8. That the Clerk of the Court shall mail copies of this Memorandum and Order to all counsel of record.